**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>BASIC ENERGY SERVICES, INC, *et al.*,<br><br>       Debtors. | Chapter 11<br><br>Case No. 21-90002 (DRJ)<br><br>(Jointly Administered) |
| DAVID DUNN, as Trustee of the Basic Energy Litigation Trust,<br><br>       Plaintiff,<br><br>          vs.<br><br>LAWRENCE FIRST, ROSS SOLOMON, DEREK JEONG, JULIO M. QUINTANA, JOHN E. JACKSON, JAMES D. KERN, TIMOTHY H. DAY, SAMUEL E. LANGFORD, AND KEITH L. SCHILLING<br><br>       Defendants. | Case No. 23-_____ |

## <u>COMPLAINT</u>

Plaintiff David Dunn, as Trustee of the Basic Energy Litigation Trust (the "<u>Trust</u>"), the successor-in-interest to certain causes of action of Basic Energy Services, Inc. ("<u>Basic HoldCo</u>") and its debtor affiliates (the "<u>Debtor-Subsidiaries</u>"[1] and, collectively with Basic HoldCo, "<u>Basic</u>" or the "<u>Company</u>"), brings this action against Lawrence "Larry" First, Ross Solomon, Derek Jeong (collectively, the "<u>Ascribe Directors</u>"), Julio M. Quintana, John E. Jackson, James D. Kern,

---

[1]   For purposes of this proceeding, the Debtor-Subsidiaries are comprised of Basic Energy Services LP, LLC, Basic Energy Services GP, LLC, Basic Energy Services, L.P., Taylor Industries, LLC, Basic ESA, Inc., SCH Disposal, L.L.C., Agua Libre Holdco LLC, Agua Libre Asset Co LLC, Agua Libre Midstream LLC, C&J Well Services, Inc., KVS Transportation, Inc., and Indigo Injection #3.

Timothy H. Day, Samuel E. Langford, and Keith L. Schilling (together with the Ascribe Directors, "Defendants").

## NATURE OF THE ACTION

1.      This action seeks damages for four separate breaches of fiduciary duty committed by Defendants in the months leading up to the Company's bankruptcy filing.

2.      <u>First</u>, this action seeks damages for breaches of fiduciary duty committed by Defendants Julio Quintana, Timothy H. Day, John Jackson, James D. Kern, Samuel E. Langford, and Keith L. Schilling (collectively, the "C&J Directors") in connection with the March 9, 2020 transaction (the "C&J Acquisition") whereby the C&J Directors recklessly caused the Company to purchase C&J Well Services, Inc. ("C&J") from NexTier Holding Co. ("NexTier") at a massively inflated price without updating the financial models to reflect the then-prevailing price of oil.

3.      On March 9, 2020, the Company purchased C&J, a well servicing provider, for consideration totaling $93.7 million, a 44% premium over the second-highest bid.  At the time of the C&J Acquisition, the Company was indisputably insolvent and in desperate need of liquidity. As such, the C&J Directors' fiduciary duties extended to the Company's creditors.

4.      Internal Company documents show that the C&J Directors knew that (i) even before the impact of hydrocarbon commodity price declines in the first quarter of 2020, C&J's business would have, at best, a modest impact on the Company's free cash flow and (ii) C&J's value and ability to generate free cash flow were highly correlated with hydrocarbon commodity prices.  A presentation drafted by the Company's Strategy and Business Development team in January 2020 concluded that the C&J Acquisition was a "suboptimal" option that would not get the Company to "salvation" and questioned whether the Company was simply "delaying the other

options" – *i.e.* a Chapter 11 filing or a debt-for-equity exchange – by acquiring C&J.

5.  Restructuring the Company's debt, however, would not serve the parochial interests of the Company's *de facto* controlling shareholder, Ascribe Capital LLC ("Ascribe").  In March 2020, Ascribe beneficially owned or controlled 15% of the Company's equity and approximately $34.4 million of the 10.75% senior secured notes due 2023 issued by Basic HoldCo (the "Secured Notes").  If the Company restructured its debt in bankruptcy or through a debt-to-equity exchange, Ascribe would receive no or *de minimis* value for its holdings of the Company's common stock and only a minority interest in the reorganized business in exchange for its Secured Notes.  Ascribe thus leveraged its control of the Company to negotiate highly favorable terms that both guaranteed Ascribe would enjoy nearly all the potential upside from the C&J Acquisition and transferred the credit risk to the Company.

6.  To finance part of the $93.7 million purchase price, Ascribe agreed to transfer $34.4 million of its Secured Notes to NexTier.  As a backstop on the value of the Secured Notes, Ascribe further agreed that, fifteen business days after first anniversary of the C&J Acquisition, if NexTier had not previously sold the Secured Notes, Ascribe would either (i) sell the Secured Notes in the market and pay the proceeds plus any difference between the sale price and par value to NexTier or (ii) repurchase the Secured Notes from NexTier for par value plus accrued interest.  In other words, Ascribe funded approximately $34.4 million of C&J's purchase price through its contribution of Secured Notes to NexTier and its commitment to sell or repurchase those same Secured Notes from NexTier at 100 cents on the dollar.

7.  In exchange for this financing package, (i) Ascribe received 82.5% of the Company's *pro forma* equity and (ii) Basic HoldCo agreed to repay (or "make whole") Ascribe for obligations paid by Ascribe to NexTier either by (x) paying Ascribe cash equal to certain

payments made by Ascribe to NexTier or (y) issuing Secured Notes to Ascribe with a **_market value_** equal to such payments (the "Make-Whole Reimbursement").    Via the Make-Whole Reimbursement, the Company effectively doubled down on its own credit risk to maintain a par value for Ascribe.

8.    From the perspective of the Company's creditors, spending all the Company's cash on hand to purchase C&J was a high-risk, low-reward proposition: the transaction would not materially improve the Company's ability to service its debt and most of the Company's creditors would not share in the benefits of the Company's improved valuation.  The opposite was true for Ascribe:  Ascribe's equity investment was out of the money and its Secured Notes were hedged against loss by the Make-Whole Reimbursement.

9.    The C&J Directors did not (and could not) determine in good faith, on an informed basis, that the C&J Acquisition was in the best interests of the Company's creditors.  Prior to the first week of March 2020, oil prices had already declined by more than 30% from the beginning of the year.  Then, in early March 2020, Saudi Arabia and Russia failed to reach an agreement on oil production levels at an OPEC+ meeting.  On March 8, 2020 – the day the C&J Directors met to approve the C&J Acquisition – Saudi Arabia announced a series of price discounts, triggering an even more dramatic free fall in oil prices.

10.    When the C&J Directors met to approve the C&J Acquisition, oil was trading at approximately $31 per barrel.  This price was well below the "downside" scenario ($40 per barrel) the Company's financial advisors prepared to evaluate the C&J Acquisition.  Inexplicably, the C&J Directors did not request that their advisors update the financial models.  Indeed, there is no evidence that the C&J Directors discussed or even mentioned these market developments **_at all_** during their deliberations.

11.     Instead, C&J Directors Julio Quintana and Keith Schilling stepped out of the March 8 Board meeting to discuss "market developments and the falling price of oil" with Ascribe's CEO, Larry First.   The Board reconvened shortly thereafter and blindly voted to approve the C&J Acquisition less than an hour later.   The C&J Directors' recklessness in approving the C&J Acquisition based on stale financial models is evidenced by the fact that ***the Company wrote-off close to 50% of C&J's purchase price within three weeks of closing and determined that it was insolvent immediately after the C&J Acquisition.***

12.     Second, this action seeks damages for breaches of fiduciary duty committed by Mr. Schilling, in his capacity as sole manager of Debtor-Subsidiary, Basic Energy Services, L.P. ("Basic LP"), in connection with the C&J Acquisition.

13.     The C&J Acquisition was financed in part with proceeds from the sale of pressure pumping assets owned by Basic LP.   Because the acquired C&J entities became direct subsidiaries of Basic HoldCo, the purchase was effectively funded via dividend.   At the time of the C&J Acquisition, upon information and belief, Mr. Schilling was the sole manager of Basic LP. Because Basic LP was insolvent at the time of the C&J Acquisition, Mr. Schilling's fiduciary duties extended to Basic LP's creditors.   Mr. Schilling breached his fiduciary duties by failing to investigate whether the C&J Acquisition was in the best interests of Basic LP and its creditors, deliberate whether to approve the C&J Acquisition in his capacity as Basic LP's manager, or evaluate whether he had different duties, different stakeholders, or different considerations than the HoldCo Board in approving the use of Basic LP's assets to fund the C&J Acquisition.

14.     Third, this action seeks damages for breaches of fiduciary duty committed by Defendants Julio M. Quintana, John Jackson, Keith L. Schilling, James D. Kern, Lawrence First, Ross Solomon, and Derek Jeong (the "Post-C&J Directors") for delaying an all-but-certain

bankruptcy filing for the sole benefit of Ascribe.

15.     Following the C&J Acquisition, the Company's financial condition continued to deteriorate.  It was clear that a bankruptcy filing was inevitable and in the best interests of the Company's creditors.  However, if the Company filed for bankruptcy before the first anniversary of the C&J Acquisition, the Make-Whole Reimbursement – a contractual, unsecured obligation of Basic HoldCo and no other Debtor – would be worthless to Ascribe.  By delaying a Chapter 11 filing, Ascribe would ensure that the Make-Whole Reimbursement would be saddled on the Debtor-Subsidiaries.  The Post-C&J Directors capitulated to the parochial interests of Ascribe and breached their fiduciary duties to the Company and its creditors by delaying a bankruptcy filing until the second quarter of 2021.

16.     Fourth, this action seeks damages for breaches of fiduciary duty committed by Mr. Schilling, in his capacity as sole director or manager of the Debtor-Subsidiaries, in connection with the March 31, 2021 transaction (the "Make-Whole Transaction") whereby Mr. Schilling caused the Debtor-Subsidiaries to become obligated to Ascribe to satisfy an obligation of Basic HoldCo alone.

17.     One year after the Company acquired C&J, Ascribe repurchased the $34.35 million of Secured Notes at par value plus accrued interest.  The Company, in turn, exhausted its remaining debt incurrence capacity by issuing $47.5 million aggregate principal amount of Secured Notes to Ascribe.  As a result of the issuance of those Secured Notes, the Debtor-Subsidiaries were saddled with new debt, secured by substantially all of the Debtor-Subsidiaries' assets, which was used to resolve a worthless claim asserted by Ascribe against a single, structurally subordinate entity.

18.     At the time of the Make-Whole Transaction, upon information and belief, Mr. Schilling was the sole director or manager of each of the Debtor-Subsidiaries.  Because the Debtor-Subsidiaries were insolvent at the time of the Make-Whole Transaction, Mr. Schilling's fiduciary duties extended to the Debtor-Subsidiaries' creditors.  In breach of his fiduciary duties, Mr. Schilling failed to investigate, inform himself, and deliberate as to the effect of the Make-Whole Transaction on the Debtor-Subsidiaries' creditors.

### JURISDICTION AND VENUE

19.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because this adversary proceeding arises under title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*, and the claims and causes of action asserted in this Complaint arise in and relate to the above-captioned jointly-administered Chapter 11 heard in this Court.

20.     This Court has personal jurisdiction over Defendants pursuant to nationwide service of process and personal jurisdiction provisions of Fed. R. Bankr. P. 7004(d), (f).

21.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

22.     Pursuant to Rule 7008-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of Texas, Plaintiff consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

### PARTIES

23.     The Trust was created in connection with the confirmed Chapter 11 plan for Basic (the "2022 Plan").  David Dunn was appointed as trustee of the Trust.  Basic's claims against Defendants were assigned to the Trust as part of the 2022 Plan.

24.     The 2022 Plan released certain of Basic's claims against certain directors and officers of Basic, but it did not release any claims against the Ascribe Directors or Mr. Day or Mr. Langford, who resigned from Basic HoldCo's board of Directors (the "Board") before the Company filed Chapter 11 in August 2021.  Nor did it release claims of gross negligence or willful misconduct against any of the Defendants.

25.     Defendant Julio M. Quintana was Chairman of the Board from December 23, 2016 until Basic filed Chapter 11 on August 17, 2021 (the "2021 Petition Date").

26.     Defendant John E. Jackson served on the Board from December 23, 2016 until the 2021 Petition Date.

27.     Defendant James D. Kern served on the Board from December 23, 2016 until the 2021 Petition Date.  Mr. Kern was designated to the Board by Ascribe.

28.     Defendant Timothy H. Day served on the Board from December 23, 2016 until his resignation effective March 9, 2020.

29.     Defendant Samuel E. Langford served on the Board from December 23, 2016 until his resignation effective March 9, 2020.

30.     Defendant Lawrence "Larry" First is Chief Investment Officer and Managing Director of Ascribe Capital.  Mr. First served on the Board from the closing of the C&J Acquisition on March 9, 2020 until the 2021 Petition Date.

31.     Defendant Ross Solomon was, during all relevant times, Managing Director at Ascribe Capital.  Mr. Solomon served on the Board from the closing of the C&J Acquisition on March 9, 2020 until the 2021 Petition Date.

32.     Defendant Derek Jeong was, during all relevant times, a Principal at Ascribe Capital.  Mr. Jeong served on the Board from the closing of the C&J Acquisition on March 9, 2020

until his resignation from Ascribe Capital effective July 30, 2021.

33.     Defendant Keith L. Schilling was President and Chief Executive Officer ("CEO") of Basic from January 2, 2020 until October 2021.  Mr. Schilling served on the Board from December 2019 until the 2021 Petition Date.  At all times relevant hereto, upon information and belief, Mr. Schilling was also the sole director or manager of each of the Debtor-Subsidiaries.

## FACTS

### I.    COMPANY BACKGROUND

34.     Headquartered in Fort Worth, Texas, Basic was a provider of production-focused services to oil and natural gas production companies in the United States.  Basic served the needs of its customers from the beginning to the end of a well's life cycle through its three business segments: (i) Well Servicing, (ii) Water Logistics, and (iii) Completion and Remedial Services.

35.     The Well Servicing segment encompassed a full range of activities performed with a mobile well-servicing rig, including the installation and removal of downhole equipment and elimination of obstructions in the well bore to facilitate the flow of oil and natural gas.  These services were performed to establish, maintain, and improve production throughout the productive life of an oil and natural gas well and to plug and abandon a well at the end of its productive life.

36.     The water logistics segment utilized a fleet of water logistics trucks and related assets, including specialized tank trucks, storage tanks, water wells, disposal facilities, and other related equipment.  These assets provided, transported, stored, and disposed of a variety of fluids. These services are required in most workover, completion and remedial projects and are routinely used in daily operations of a productive well.

37.     The completion and remedial services segment operated specialized rental equipment and fishing tools, coiled tubing units, and other equipment.  The Company's customers utilized completion services to establish production from an oil or gas well after initial drilling operations have been completed and remedial services to repair leaks, fish equipment from wellbores, and close non-productive perforations in well casings.

## II.     2016 BANKRUPTCY FILING & EVENTS LEADING UP TO THE C&J ACQUISITION

38.     Like many of its customers and peers in the oil and gas industry, Basic suffered from the sustained drop in oil prices that began in 2014.  As prices tumbled and remained low, many exploration and production companies ("E&P Companies") significantly cut capital and operating expenses.  Companies like Basic that provided services to distressed E&P Companies felt the ripple effects of decreased spending on well development and maintenance in their top line revenues and EBITDA.

39.     In the spring of 2016, Basic initiated restructuring discussions with a group of its secured noteholders, which included Ascribe, a hedge fund that invests in distressed companies. These negotiations led to a consensual restructuring transaction that was implemented through a prepackaged plan of reorganization.  On October 24, 2016, Basic and certain of its affiliates filed Chapter 11 cases in the United States Bankruptcy Court for the District of Delaware (the "2016 Chapter 11 Cases").

40.     Pursuant to Basic's prepackaged plan (the "2016 Plan"), noteholders exchanged approximately $800 million of debt for common stock in the reorganized company.  Under the 2016 Plan, Ascribe received approximately 4,000,000 shares of common stock, representing about 16% of the outstanding shares.

41.     The 2016 Plan also gave Ascribe the right to designate one director to the Board. Ascribe designated James D. Kern.  Upon information and belief, Mr. Kern had a pre-existing relationship with Ascribe and was designated by Ascribe to the boards of several of Ascribe's portfolio companies.

42.     Following its emergence from the 2016 Chapter 11 Cases, the Company continued to face significant operational challenges and adverse industry trends that again constrained its liquidity.  In 2018, the Company sought to refinance its secured indebtedness.  These efforts resulted in the issuance of the Secured Notes in an aggregate principal amount of $300 million and the execution of an asset-based revolving credit facility with an initial maximum aggregate principal commitment amount of $150 million (the "ABL Facility").  The Secured Notes were guaranteed on a joint and several basis by each of the Debtor-Subsidiaries and were secured by substantially all the Debtor-Subsidiaries' assets, subject to customary exceptions and exclusions (the "Secured Notes Collateral").  The ABL Facility was secured by a first-priority lien on receivables and certain cash and deposit accounts (the "ABL Collateral").  As another measure to address its financial difficulties, the Company divested its contract drilling operations in 2018 and its pressure pumping assets in the second half of 2019.

43.     Nevertheless, the Company continued to struggle.  In 2019, to address its deteriorating financial condition, the Company retained Weil Gotshal & Manges ("Weil") and Lazard Freres & Co. LLC ("Lazard") to evaluate potential deleveraging transactions, including a Chapter 11 filing, a debt-to-equity exchange of the Secured Notes, and an acquisition of C&J.

**III.   THE C&J ACQUISITION**

     **A.     The Company Was Insolvent When it Acquired C&J.**

44.     The Company was indisputably insolvent and in desperate need of liquidity when

it acquired C&J.  Internal Company documents show that, as early as November 2019, the Company was delaying payments to vendors.  Materials prepared by Lazard to evaluate the C&J Acquisition showed that the *status quo* was unsustainable and ascribed no value to the Company's equity.

45.     The market understood that the Company was insolvent.  In the first three quarters of 2019, the Company reported net losses of $27.5 million ($1.02 per share), $27.8 million ($1.02 per share), and $38.9 million ($1.52 per share), respectively.  As a result, the Company's stock price fell from approximately $5 per share in January 2019 (representing a market capitalization of approximately $158 million) to less than $0.30 per share in December 2019 (representing a market capitalization of less than $11 million).  On March 9, 2020, when the C&J Acquisition closed, the Company's **secured debt** was trading at 66 cents on the dollar and the Company's equity market capitalization was $4 million.  This market capitalization represented only the option value of the business (based on the theoretical chance that the Company could have a miraculous turnaround), not any real fundamental value above the debt.

46.     On December 3, 2019, the Company reported that the New York Stock Exchange ("NYSE") had determined to suspend trading in the Company's common stock immediately and to commence proceedings to delist the Company's stock pursuant to Section 802.01B of the NYSE's Listed Company manual, which requires listed companies to maintain an average global market capitalization over a consecutive 30 trading-day period of at least $15 million.

**B.     The C&J Acquisition Would Leave the Company Undercapitalized and Unable to Pay its Debts as They Came Due.**

47.     In the Fall of 2019, the Company retained Morgan Stanley & Co. LLC ("Morgan Stanley") to procure financing for the C&J Acquisition.  Morgan Stanley contacted several potential outside equity investors, but none expressed meaningful interest.  According to internal

Company documents relaying feedback from these investors, a "common refrain was that there was still too much leverage."  In other words, equity investors feared that their investment would fail because the *pro forma* business could not service the debt load.  The market reaction clearly evidenced that the C&J Acquisition would leave the Company undercapitalized and unable to pay its debts as they came due.

48.    The market reaction was consistent with the Company's own analysis of the C&J Acquisition.  A presentation, dated January 2, 2020 (the "January 2 Presentation"), drafted by the Company's Strategy and Business Development team concluded that the C&J Acquisition was a "suboptimal" option that would not "get [the Company] to salvation" because the Company would still be overleveraged.  The presentation questioned whether the Company was simply "delaying the other options" – *i.e.* a Chapter 11 filing or a debt-to-equity exchange – by acquiring C&J, and expressed concern that the Board would pursue the acquisition of C&J "at any costs."

49.    Those concerns were warranted.  In mid-December 2019, Lazard met with the two largest holders of the Secured Notes – Goldman Sachs and Whitebox – to discuss a potential debt-to-equity exchange.  Both investors were supportive.  The January 2 Presentation summarized Lazard's conversations with Goldman Sachs and Whitebox, noting that Goldman Sachs was "open to a debt-to-equity conversion" and "uncharacteristically" did "not seem to be religious" about payment of the April 2020 interest due on the Secured Notes, and "acknowledged that in some circumstances it could be better to leave that cash in the company."  The presentation also noted that Whitebox was "open to and willing to be constructive for a debt-to-equity conversion" and "willing to get restricted to have constructive conversations."

50.     Despite this positive feedback, the Company never followed up with Whitebox, Goldman Sachs, or any other noteholder because a debt-to-equity exchange would not serve the parochial interests of Ascribe, the Company's *de facto* controlling shareholder.  In a debt-to-equity exchange, Ascribe would receive (i) no or *de minimis* value for its holdings of the Company's common stock, which was out-of-the-money based on any reasonable valuation, and (ii) only a minority interest in the Company's *pro forma* equity in exchange for its Secured Notes (which represented less than 12% of the aggregate principal amount of Secured Notes outstanding). Accordingly, and exactly as the Company's Strategy and Business Development team feared, Ascribe leveraged its control of the Company to pursue the C&J Acquisition at "any costs" to the detriment of the Company and its other stakeholders.

    **C.**    **The Company Pursued the C&J Acquisition at "Any Costs."**

            *i.*   *The Company Paid a Significant Premium Over the Second-Highest Bid as Oil Prices Plummeted to Historic Lows.*

51.     Upon information and belief, in December 2019, NexTier received a bid to purchase C&J for $65 million cash.  NexTier signaled to the Company that it planned to proceed with this bid.  Undeterred, on or about January 9, 2020, Ascribe and the Company's CEO met with NexTier's CEO to – in Ascribe's words – "discuss how to get a deal done."  NexTier demanded both a significant premium over the current highest bid and imposed onerous deal terms, including that (i) NexTier would not be required to provide audited financials for C&J, (ii) NexTier would not need to support the business post-closing to ensure a smooth integration, and (iii) the transaction would not require the Company's stockholder approval.

52.     On or about January 11, 2020, the Company and Ascribe sent NexTier a proposal to acquire C&J for a total purchase price of $90 million, ***a premium of almost 40% over the second-highest bid***.  The proposal conceded that the Company would not (i) demand audited

14

financials for C&J, (ii) require integration support from NexTier post-closing, or (ii) seek stockholder approval.

53.     Within days of the January 11 proposal, the oil market was in a historic free fall. Oil prices began a steep decline on January 20, 2020 when China (the world's largest importer of crude oil) reported a sharp rise in COVID-19 cases. Then, in early March 2020, Saudi Arabia and Russia failed to reach an agreement on oil production levels at an OPEC+ meeting. On March 8, 2020, Saudi Arabia announced a series of price discounts, triggering an even more dramatic free fall in oil prices. Between January 2020 and March 9, 2020, when the C&J Acquisition closed, oil prices fell by more than 50%.



Price of Crude Oil (WTI)
Between January and March 2020

54.     The Company and the C&J Directors knew that the C&J business would have, at best, a modest impact on free cash flow and that C&J's value and ability to generate free cash flow were highly correlated with hydrocarbon commodity prices. During July and August 2018, the Board participated in a four-day workshop (the "AlixPartners Workshop") hosted by AlixPartners LLP ("AlixPartners") to "align and articulate a market-based strategy for Basic Energy Services' management team to execute." AlixPartners evaluated eighteen potential strategic options "based on their impact and complexity to support informed decision making." AlixPartners ranked the strategy of acquiring and consolidating well services operations (like C&J) as "low priority" given

the meager impact on free cash flow, complexity, and high implementation risk. Notably, the "primary risk" identified in connection with the well services segment was that its revenue was "highly correlated with commodity price." AlixPartners concluded that "commodity price is the primary driver of business EBITDA."

55.     Nevertheless, as oil prices plummeted, the Company agreed to pay ***an additional $3.7 million*** for C&J. On March 9, 2020 (the "C&J Closing Date"), the Company purchased C&J from NexTier for consideration totaling $93.7 million – ***a 44% premium over the second-highest bid***.

> ### ii.   The Company Incurred Additional Debt and Assumed Significant Credit Risk to Finance the C&J Acquisition.

56.     To finance the C&J Acquisition, the Company used nearly ***all of its cash on hand*** – including $39 million in proceeds from the sale of a Debtor-Subsidiary's pumping services assets – and incurred ***an additional $15 million of debt*** pursuant to that certain Senior Secured Promissory Note (the "Promissory Note") issued to Ascribe on the C&J Closing Date.

57.     The Company also assumed significant credit risk. The terms of the C&J Acquisition were documented in a Purchase Agreement, dated March 9, 2020, by and among Ascribe III Investments LLC, Basic Energy Services, Inc., NexTier Holding Co., and C&J Well Services, Inc. (the "Purchase Agreement"). Pursuant to the Purchase Agreement, in exchange for C&J, the Company paid NexTier $59.35 million in cash, and Ascribe transferred and delivered to NexTier Secured Notes in an aggregate principal amount equal to $34.35 million.

58.     Under the Purchase Agreement, if NexTier held the Secured Notes until March 2021, Ascribe would sell them for cash and pay the proceeds to NexTier. If the sale of the Secured Notes yielded proceeds of less than the par value of the Secured Notes, Ascribe would pay NexTier, in cash, an amount equal to the excess of the par value over the sale price plus accrued

interest.  In turn, Basic HoldCo was obligated to reimburse Ascribe for any make-whole payment that Ascribe paid to NexTier, either in cash or in the form of issuing additional Secured Notes with a ***market value*** equal to such payment.

59.     In connection with its transfer of the Secured Notes to NexTier, Ascribe and the Company entered into the Exchange Agreement, dated as of March 9, 2020, by and between Basic Energy Services, Inc. and Ascribe III Investments LLC (the "Exchange Agreement").  Pursuant to the Exchange Agreement, in exchange for its contribution of the Secured Notes, Ascribe received 118,805 shares of new preferred stock of Basic – representing approximately 82.5% of the total shares outstanding – a $1.525 million closing fee, and $1.5 million in accrued interest on the Secured Notes.

60.     The Secured Notes, however, were not cancelled.  On the first anniversary of the C&J Acquisition, Ascribe would sell the Secured Notes to pay NexTier ***and*** receive the difference between the par value and the sale price from the Company.  On the C&J Closing Date, the Secured Notes were trading at 66 cents on the dollar.  Via the Make-Whole Reimbursement, the Company would cover the ***existing impairment*** and ***further downside*** in Ascribe's Secured Notes investment – if the value of the Secured Notes declined, Ascribe would be "made whole" for any out-of-pocket costs incurred in connection with its Make-Whole Guarantee obligation at the expense of the Company and its creditors.  Unlike all other holders of the Secured Notes, Ascribe was insulated from market downside due to the Company's obligation to pay cash or additional notes to maintain a par value for Ascribe.

        iii.    *The Company Massively Overpaid for C&J and was Rendered Further Insolvent Immediately After the C&J Acquisition.*

61.     In connection with the C&J Acquisition, the Company recorded $18.8 million of goodwill as part of its Well Servicing and Water Logistics reporting units.  In its 10-Q for the first

quarter of 2020, the Company disclosed that it experienced a significant reduction in demand for its services due to the significantly decreased price of crude oil resulting from the COVID-19 pandemic and the price discounts announced by Saudi Arabia on March 8, 2020.  Accordingly, as of March 31, 2020, the Company updated its internal long-term outlook for each of the Well Servicing and Water Logistics reporting units and determined that the decreased energy industry outlook was an indicator requiring further analysis for impairment of goodwill, and that it was more likely than not that the fair value of certain reporting units were less than their carrying value. As a result, the Company performed an interim goodwill impairment test.

62.    As part of its goodwill impairment testing, the Company updated its assessment of future cash flows using historical data supplemented by current and anticipated market conditions and applying expected long-term growth rates, discount rates, and terminal values that the Company considered reasonable for each reporting unit.  The Company calculated the present value of its projected cash flows to determine fair value.  The Company's analysis showed that the fair value of the Well Servicing reporting unit was less than its carrying value, indicating an impairment of $10.6 million of the goodwill recorded in connection with the C&J Acquisition. The Company impaired the remaining $8.2 million of goodwill by year-end.

63.    In addition, the reduction in demand for the Company's services indicated that certain long-lived tangible and identified intangible assets may be impaired.  The Company thus performed recoverability testing at the total segment asset group level (the lowest level of discrete and identifiable cash flows) using a probability weighted estimate of undiscounted future cash flows using expected long-term growth rates.  The Company's analysis indicated that certain long-lived assets within the Well Servicing reporting unit – including certain of C&J's assets – were not recoverable.  As a result, the Company took additional impairment charges of $35.2 million

related to property, equipment, and inventory purchased in connection with the C&J Acquisition.

64.     Materials presented to the Audit Committee of the Board concluded that "[a]s a result of the asset impairments taken in the first quarter, the fair value of the Company's assets ***are less than the liabilities of the Company under the current definition in the ABL***."  (emphasis added).  Basic's 10-Q for the first quarter of 2020 also disclosed that "[d]ue to the uncertainty of future oil and natural gas prices and the effects the outbreak of COVID-19 will have on our future results of operations, operating cash flows and financial condition, there is substantial doubt as to the ability of the Company to continue as a going concern."

65.     In short, following its valuation, the Company wrote off close to 50% of C&J's purchase price within three weeks of closing and determined that it was insolvent immediately after the C&J Acquisition.

### D.     The C&J Directors' Decision to Approve the C&J Acquisition is Subject to Entire Fairness Review or, at a Minimum, Heightened Scrutiny.

66.     At the time of the C&J Acquisition, the Board was composed of the six C&J Directors directors: (i) Julio Quintana (Chairman of the Board), (ii) Timothy Day, (iii) John Jackson, (iv) James Kern (Ascribe's designee), (v) Samuel Langford, and (vi) Keith Schilling (Basic's CEO).  In January 2020, Basic constituted a special committee of purportedly independent directors to evaluate and negotiate the C&J Acquisition.  The special committee consisted of (i) Mr. Quintana, (ii) Mr. Day, and (iii) Mr. Jackson (collectively, the "C&J Special Committee").

67.     The C&J Directors retained Morgan Stanley, Lazard, and Houlihan Lokey Capital, Inc. ("Houlihan Lokey") to assist them in evaluating the C&J Acquisition.  Morgan Stanley, as financial advisor to the Company, considered the impact of the C&J Acquisition on the Company's debt, capital structure, and liquidity.  Morgan Stanley was conflicted with respect to the C&J Acquisition because its fees were contingent on the deal closing.  The C&J Directors engaged

Lazard to provide an independent analysis of the C&J Acquisition as well as other strategic alternatives to the Company.  The C&J Directors retained Houlihan Lokey to deliver a fairness opinion for the purchase price of C&J and the terms of the Exchange Agreement.  The Company retained Houlihan Lokey because (i) the Company's legal counsel was concerned that Morgan Stanley was conflicted and (ii) Lazard could not provide a fairness opinion on the accelerated schedule required by the transaction.

68.     The C&J Directors' decision to approve the C&J Acquisition is subject to entire fairness review because (i) Ascribe controlled the Company at the time of the C&J Acquisition and (ii) the C&J Directors did not act on an informed basis.  At a minimum, the decision is subject to heightened scrutiny because the C&J Acquisition effected a change of control.

<em>i.  Ascribe Controlled the Company at The Time of The C&J Acquisition.</em>

69.     Ascribe exercised *de facto* control over the Company at the time of the C&J Acquisition.  Between December 2016 and March 2020, Ascribe's equity stake in the Company fluctuated between approximately 15% and 20%.  At all relevant times, Ascribe was the Company's largest shareholder.  Ascribe also owned $34.35 million of the Company's Secured Notes.  Ascribe designated Mr. Kern to the Board and also actively participated in the search for, and selection of, Mr. Schilling as CEO in December 2019.  No other shareholder participated in this manner.

70.     Ascribe and the Company did not negotiate the C&J Acquisition at arms' length, as two independent, adverse counterparties would.  On the contrary, Ascribe and the Company drafted the deal term sheets jointly, traveled together to meet with NexTier's CEO to discuss "how to get a deal done," and began working together, along with advisors recommended by Ascribe, on merger integration logistics weeks before the C&J Directors met to approve the C&J Acquisition.  Indeed, representatives of Ascribe and the Company met to discuss integration

logistics on or about February 20, 2020, before the Company's financial advisors completed their analyses and presented their conclusions to the C&J Directors.

71.     The record also shows that Mr. First worked directly with Lazard, the Company's financial advisor, to evaluate strategic options for the Company.  For example, on October 30, 2019, Adam Hurly – the Company's Vice President for Strategy and Business Development – sent members of Morgan Stanley's team materials Lazard prepared "for Larry" analyzing a spinoff of the Company's water logistics business and merger of the remaining wellsite services and completions divisions with an industry peer.  Mr. Hurley noted that the analysis was "similar to something else Larry is working on w/Lazard," suggesting that the Company's financial advisor regularly worked for, and at the direction of, Mr. First.

72.     Mr. Hurley's email also suggested that Mr. First would likely leverage Ascribe's ownership of the Secured Notes to block transactions that would not advance Ascribe's interests ("With Larry at 12% is it realistic we can amend [the indentures]?" Mr. Hurley asked).  Because any successful debt-to-equity exchange offer would require a high noteholder acceptance rate (typically 95% or more), Ascribe could block the Company from pursuing a restructuring and force it to the deal it preferred.  This was no accident.  Ascribe itself described its strategy to investors as "[s]eeking the optimal place in the capital structure on a risk/reward basis to protect investment in case of a potential restructuring."

73.     Critically, by the Company's own admission, the Company was so beholden to Ascribe that it could not pursue its own separate interests in connection with the C&J Acquisition.  A memorandum prepared by the Company's accounting team and reviewed by the Company's CFO, David Schorlemer, concluded that Ascribe met the Accounting Standards Codification ("ASC") definition of "related party" at the time of the C&J Acquisition.  The memorandum

reasoned that "Ascribe possessed 15% common equity ownership in Basic as well as $34.35M of senior notes, par value. After the transaction, Ascribe gains beneficial ownership of approximately 85% of equity. The Company believes that Ascribe can significantly influence its managements in its decision making given all factors involved."

74.     Considering these factors, the memorandum concluded that Ascribe qualified as a "related party" pursuant to clauses (f) and (g) of the ASC definition, which provide as follows:

> f.     "parties with which the entity may deal if one party **controls or can significantly influence** the management or operating policies of the other **to an extent** that one of the transacting parties might be **prevented from fully pursuing its own separate interests**" (emphasis added); and

> g.     "parties that can **significantly influence** the management or operating policies of the transacting parties **or that have an ownership interest** in one of the transacting parties and can significantly influence the other **to an extent** that one or more of the transacting parties might be **prevented from fully pursuing its own separate interests**" (emphasis added).

By the Company's own admission, Ascribe "controlled" or "significantly influenced" the Company "to an extent" that the Company was "prevented from fully pursuing its own separate interests" in connection with the C&J Acquisition.

75.     The Board minutes from the day the C&J Directors met to approve the C&J Acquisition reflect Ascribe's influence and control. Prior to the first week of March 2020, oil prices had **already** declined by more than 30% from the beginning of the year. Then, in early March 2020, Saudi Arabia and Russia failed to reach an agreement on oil production levels at an OPEC+ meeting. On March 8, 2020, Saudi Arabia announced a series of price discounts,

triggering an even more dramatic free fall in oil prices.  Below is a sample of oil price headlines

on March 8, 2020 – the day the C&J Directors met to approve the C&J Acquisition.



76.     In light of this market turmoil, Ascribe had to ensure that the C&J Directors did not

get cold feet.   According to the March 8 Board minutes, "Mr. Quintana stated that he and Mr.

Schilling were receiving calls from Mr. Lawrence First on behalf of Ascribe, and had received

requests to discuss [the C&J Acquisition] given market developments and the falling price of oil

in overseas markets occurring during the meeting."  The Board declared a recess at approximately

6:05 p.m. for Mr. Quintana and Mr. Schilling to contact Mr. First.  The Board reconvened at

approximately 6:50 p.m. and voted to approve the C&J Acquisition less than an hour later.

*ii.    The C&J Directors Did Not Act on an Informed Basis.*

77.     For the reasons discussed below, the C&J Directors did not act on an informed basis

when they approved the C&J Acquisition.

78.     <u>First</u>, the C&J Directors blindly and recklessly approved the C&J Acquisition knowing that hydrocarbon commodity prices no longer supported the financial performance required to justify the transaction.  By the time the C&J Directors met to approve the C&J Acquisition on March 8, 2020, oil was trading at approximately $31 per barrel, versus $62 per barrel in January 2020 when C&J's sale price was negotiated.  Contemporaneous press reports show that by March 8, 2020, Morgan Stanley itself forecasted oil trading as low as $30 per barrel in the second quarter of 2020.  This forecast was well below the "downside" scenario ($40 per barrel) Morgan Stanley and Lazard prepared to evaluate the C&J Acquisition.

79.     Making matters worse, the C&J Directors knew that, even before the impact of commodity price decline in the first quarter of 2020, (i) C&J would have, at best, a modest impact on free cash flow and (ii) C&J's value and ability to generate free cash flow were highly correlated with hydrocarbon commodity prices.  Except for Mr. Schilling (who had not yet joined the Company), each of the C&J Directors participated in the AlixPartners Workshop where AlixPartners ranked the strategy of acquiring and consolidating well services operations (like C&J) as "low priority" given the meager impact on free cash flow and concluded that "commodity price is the primary driver of business EBITDA."  Of course, the C&J Directors also knew this because the Company had previously filed Chapter 11 due to commodity price volatility.

80.     While Mr. Schilling had not yet joined the Company when AlixPartners presented these materials to the Board, Mr. Schorlemer e-mailed the AlixPartners materials to Mr. Schilling on January 3, 2020.  The documents were thus fresh in Mr. Schilling's mind when he approved the C&J Acquisition.  Despite this knowledge, Mr. Schilling and the other C&J Directors recklessly failed to have the financial models refreshed or reconsidered before they approved the C&J Acquisition.  Indeed, there is no indication that the C&J Directors discussed the impact of

plummeting oil prices *at all* prior to approving the C&J Acquisition.

81.     Second, the materials Lazard prepared to evaluate the C&J Acquisition focused on whether the alternatives were better from the perspective of the Company's *shareholders* (which were out-of-the-money), not its creditors.  Because the Company was insolvent at the time of the C&J acquisition, the C&J Directors were obligated to consider whether the C&J Acquisition was better than the alternatives (including a debt-to-equity exchange) to ensure that the Company's creditors would not suffer losses from any further decline in the Company's enterprise value. During Board meetings held on November 20 and 21, 2019, the C&J Directors (other than Mr. Schilling, who was not present) were advised of their "expanded duties in the case of insolvency" as well as "additional issues relating to insolvency, including timing and the shifting of duties." The C&J Directors knowingly breached their fiduciary duties by failing to consider whether the C&J Acquisition was the best alternative available to the Company's creditors, or whether the *pro forma* Company would have sufficient liquidity to repay the Secured Notes.

82.     Third, while the C&J Directors obtained a fairness opinion from Houlihan Lokey, Houlihan Lokey's engagement letter makes clear that its fairness opinion excludes consideration of (i) the Make-Whole Reimbursement, a critical aspect of the consideration Ascribe received in connection with the C&J Acquisition, or (ii) the fairness of the C&J Acquisition to the Company's creditors.  Moreover, Houlihan Lokey's analysis was largely a desktop exercise in nature, conducted in one week, and consisting solely of comparables with no discounted cash flow analysis.  Mr. Hurley himself described the fairness opinion as a "racket."

83.     Critically, Houlihan Lokey determined that the Company "got" more than it "gave" Ascribe because it excluded from the analysis the Make-Whole Reimbursement and ascribed no value to the equity Ascribe received in connection with the C&J Acquisition.  Houlihan Lokey's

analysis simply ignored the equity value of C&J.   Taking into account the Make-Whole Reimbursement and the equity value of C&J – which is essential to properly evaluate whether the transaction was fair – Ascribe received nearly three times the value it gave in return.   Specifically, as shown in the diagram below, ***Ascribe gave approximately $49 million of value***, consisting of:

- a $15 million bridge loan; and

- a commitment to pay NexTier $34.35 million in cash on the first anniversary of the C&J Acquisition.

In exchange, ***Ascribe got approximately $133 million of value***, consisting of:

- $1.5 million cash for accrued interest on the Secured Notes;

- Secured Notes worth approximately $22.7 million on the C&J Closing Date;

- Make-Whole Reimbursement worth approximately $11.7 million on C&J Closing Date;[2]

- $1.525 million cash in closing fees;

- $15 million secured Promissory Note;

- 3 board seats on a 7-person board; and

- 82.5% of the equity in the *pro forma* business.  While C&J was worth far less than the $93.7 million Basic paid for it, when the C&J Directors approved the C&J Acquisition, they either (i) knowingly caused an insolvent Basic to overpay for C&J or (ii) believed C&J was worth the $93.7 million Basic paid for it and approved a transaction whereby Basic's controlling shareholder got three times the value it gave in exchange.

---

[2]   Calculated as the difference between the par value of the Secured Notes contributed by Ascribe ($34.35 million) and the sale price of the Secured Notes on the C&J Closing Date ($22.7 million).



84.     <u>Fourth</u>, the C&J Directors failed to consider whether a debt-to-equity exchange would be preferable to the C&J Acquisition because it could be structured to preserve the Company's Net Operating Losses ("<u>NOLs</u>").  In its 10-Q for the first quarter of fiscal 2020, the Company reported that, as a result of the change-of-control effected by the C&J Acquisition, the Company lost nearly $620 million of its NOLs.  During the November 20-21 Board meetings, the C&J Directors (other than Mr. Schilling) were advised of "NOL, tax credit and built-in losses implications following an ownership change."  The C&J Directors thus knew that the C&J Acquisition would cost the Company valuable NOLs.  The C&J Directors also knew that a debt-to-equity exchange could be structured to preserve the NOLs.  On December 10, 2019, Lazard distributed to the C&J Directors a presentation analyzing a potential debt-to-equity exchange.  The

materials noted that "careful consideration must be given to the tax implications of cancelling debt in order to preserve tax attributes and the ability to utilize NOLs." The C&J Directors, determined to pursue the C&J Acquisition "at any cost," simply ignored this inconvenient fact. There is no indication that the C&J Directors ever reviewed or requested any analysis comparing the tax implications of the C&J Acquisition versus a debt-to-equity exchange.

      *iii.  At a Minimum, The Decision to Approve The C&J Acquisition is Subject to Heightened Scrutiny.*

85.      The C&J Acquisition effected a change of control whereby Ascribe acquired 82.5% of the Company. The minutes for the December 5, 2019 meeting of the Board – which Mr. Quintana, Mr. Patterson, Mr. Jackson, Mr. Langford, Mr. Day, and Mr. Kern attended – state that the directors were advised by counsel of their *Revlon* duties in connection with the C&J Acquisition, including the importance of reviewing and assessing other proposals after an initial agreement with Ascribe was reached. The C&J Directors knowingly breached their *Revlon* duties by ignoring alternative bidders and making no effort to market-test the terms of Ascribe's financing.

86.      In January 2020, the Company received an offer from Sound Oak Holdings LLC ("Sound Oak") to purchase the Company. According to the January 7, 2020 Board minutes, the C&J Directors determined that the offer was "not aligned with the Company's strategic plans" and was not "credible." There is no indication why the C&J Directors, who were actively contemplating a sale of the Company to Ascribe in connection with the C&J Acquisition, believed that a sale of the Company to Sound Oak was "not aligned with the Company's strategic plans." Nor is there any indication why the C&J Directors believed the offer was not "credible." Upon information and belief, the C&J Directors did not engage with Sound Oak or make any effort to test their unsupported assumption that Sound Oak's offer was not credible. The C&J Directors

28

summarily dismissed the offer during a 30-minute Board meeting.

87.     The C&J Directors also made no effort to market-test the terms of Ascribe's financing.  During a December 10, 2019 Board meeting, T.M. "Roe" Patterson – who was replaced by Mr. Schilling as the Company's CEO in January 2020 – "shared his perspective that equity holders and debtholders of the Company ha[d] expressed more willingness to engage in discussions with the Company regarding strategic transactions than in previous cyclical energy market downturns."  During the February 19, 2020 meeting, the C&J Special Committee asked Mr. Schilling whether other debtholders might be interested in a debt-to-equity exchange in addition to Ascribe.  Mr. Schilling responded that the Company had "previously contacted other debtholders over the holiday period regarding potential strategic alternative transactions" and "these preliminary negotiations were unproductive."  That was, at best, a gross mischaracterization of the facts.

88.     As noted above, in mid-December 2019, Lazard met with the two largest holders of Secured Notes – Goldman Sachs and Whitebox – to discuss a potential debt-to-equity exchange. Both were generally supportive, and Mr. Schilling knew this.  Upon information and belief, Lazard's conversations with Goldman Sachs and Whitebox were relayed to Mr. Schilling on or around January 2, 2020.  Despite receiving positive feedback from its two largest noteholders regarding a potential debt-to-equity exchange, there is no indication that the Company ever reached out to the non-Ascribe noteholders to market-test the terms of Ascribe's financing proposal.  Nor did the Company seek to address its insolvency through a rational restructuring as it did with its 2016 prepackaged bankruptcy filing.

### E. Mr. Schilling Breached His Fiduciary Duties to the Debtor-Subsidiaries in Connection with the C&J Acquisition.

89.     Upon information and belief, at the time of the C&J Acquisition, Mr. Schilling was the sole director or manager of each of the Debtor-Subsidiaries.  Mr. Schilling was also Basic's CEO and a member of Basic HoldCo's Board, rendering him a fiduciary of both Basic HoldCo and the Debtor-Subsidiaries and deeply conflicted with respect to the C&J Acquisition.

90.     Mr. Schilling failed to investigate whether the C&J Acquisition was in the best interests of Debtor-Subsidiaries before consenting to the transaction.  Mr. Schilling did not, in his capacity as director or manager of the Debtor-Subsidiaries, deliberate whether to approve the C&J Acquisition.

91.     The C&J Acquisition was financed in part with proceeds from the sale of pressure pumping assets owned by Debtor-Subsidiary, Basic LP.  Because the acquired C&J entities became direct subsidiaries of Basic HoldCo, rather than Basic LP, which funded the transaction, the purchase was effectively funded via dividend (*i.e.*, a transfer by a Debtor-Subsidiary to its parent for no direct consideration).  Mr. Schilling did not retain advisors or evaluate whether he had different duties, different stakeholders, or different considerations than the HoldCo Board in approving the use of Basic LP's assets to fund the C&J Acquisition.

92.     Moreover, pursuant to the Exchange Agreement, if the Company did not have cash sufficient to satisfy Basic HoldCo's Make-Whole Reimbursement obligation to Ascribe, Basic HoldCo was obligated to issue Secured Notes guaranteed on a joint and several basis by each of the Debtor-Subsidiaries.  Mr. Schilling did not retain advisors or evaluate whether he had different duties, different stakeholders, or different considerations than the HoldCo Board in approving the C&J Acquisition and potentially saddling the Debtor-Subsidiaries with the Make-Whole Reimbursement obligation.

93.     Because the Debtor-Subsidiaries were insolvent at the time of the C&J Acquisition, Mr. Schilling's fiduciary duties extended to the Debtor-Subsidiaries' creditors in the transaction. Mr. Schilling was interested and conflicted in the transaction by virtue of his dual role as a director of Basic HoldCo, whose interests were adverse based on the Debtor-Subsidiaries' insolvency and the fact that the Debtor-Subsidiaries were insolvent and did not receive reasonably equivalent value for the obligations they incurred. Mr. Schilling breached his fiduciary duties by failing to investigate, inform himself, and deliberate as to the effect of the C&J Acquisition on the Debtor-Subsidiaries' creditors.

## IV.     BASIC'S CORPORATE GOVERNANCE POST-C&J ACQUISITION

94.     Pursuant to the Purchase Agreement and ancillary agreements, following the C&J Acquisition, the Board was expanded from six to seven members, with Mr. Quintana, Mr. Jackson, Mr. Schilling, and Mr. Kern continuing in their roles, Mr. Day and Mr. Langford resigning, and Ascribe designating three directors: Mr. First, Mr. Solomon, and Mr. Jeong (all Ascribe insiders). Notably, the Compensation Committee of the Board consisted of four members – the three Ascribe Directors and Mr. Kern, who had been nominated by Ascribe pursuant to the 2016 Plan. This further solidified Ascribe's control over Company management.

95.     On August 31, 2020, the Board established a special committee consisting of two purportedly independent directors – Mr. Quintana and Mr. Jackson (the "Post-C&J Special Committee"). The Board delegated to the Post-C&J Special Committee the power to, among other things, evaluate, negotiate, and make recommendations to the Board with respect to various strategic alternatives, including but not limited to, a capital markets transaction, debt issuance, restructuring and/or other balance sheet transactions to maximize the value of the Company and its assets.

## V.   AN INSOLVENT BASIC DELAYS BANKRUPTCY FOR THE SOLE BENEFIT OF ASCRIBE

96.     Following the C&J Acquisition, Basic's financial condition continued to deteriorate.  Oil prices plummeted as a result of the COVID-19 pandemic and the Russia-Saudi Arabia oil price war, reducing demand for Basic's products and services and leading to recurring losses from operations.  It was clear that a bankruptcy filing was inevitable and in the best interests of Basic's creditors.

97.     However, if the Company filed for bankruptcy before the first anniversary of the C&J Acquisition, the Make-Whole Reimbursement – an obligation of Basic HoldCo alone –would be worthless to Ascribe.  By delaying a Chapter 11 filing, Ascribe would ensure that the Make-Whole Reimbursement would be saddled on the Debtor-Subsidiaries, and Ascribe would be off the hook.  For the sole benefit of Ascribe, the Company delayed an all-but-certain bankruptcy filing by extending trade payables, incurring more debt, and launching a botched and pointless exchange offer that the Company knew or should have known would fail.

### A.  Basic Extends Trade Payables.

98.     The Company's liquidity position became so precarious by the second quarter of 2020 (the very quarter in which the C&J Acquisition closed) that management worried about its ability to make payroll and other payments coming due.  These liquidity pressures forced the Company to extend the payment cycles for some vendors and prioritize critical vendors over less consequential ones, as well as to balance the need to pay vendors against the need to service the Company's debts.  The Company's total accounts payable stood at approximately $27 million in January 2020 and $60.6 million by August 17, 2021 (when the Company filed Chapter 11 for the second time).  The Company's accounts payable outstanding over 60 days began increasing in the second quarter of 2020, with a dramatic increase at the beginning of the third quarter.

99.     By late October 2020, the Company's ability to pay its vendors was dire. An employee emailed the Company's corporate controller stating that an important vendor had threatened to terminate its relationship with the Company if the vendor's full outstanding balance (only approximately $30,000) was not paid, which would be "devastating to [the Company's] operations in this area."  In response, the corporate controller stated that "AP payments have been very small and very few" and that "we are only going to have a certain amount to spend and cannot go over that amount for any reason what so ever … [o]nce money has been spent for a week there is no more to spend regardless of who the vendor is."

100.     As of October 28, 2020, the Company had $38.6 million in payables outstanding over 60 days; $25 million of those were outstanding over 120 days.  Just a little over a month later, payables outstanding over 60 days stood at $40.7 million (a more than 5.4% increase in the span of a month), with $29.1 million outstanding for more than 120 days (a more than 16% increase in the span of a month), and the Company observed a dangerous trend in increasing payables outstanding over 180 days.

101.     The charts on the following page illustrate the evolution of the Company's accounts payable between October 2020 and March 2021.



102.    As the Company continued to default on payment terms with its vendors, it faced increased pressure – including more aggressive demands for payment and threatened or actual lawsuits – and deteriorating trade terms.

103.    Throughout this time, the Post-C&J Directors were kept apprised of the situation. The Board was notified as early as March 27, 2020 (the very month the C&J Acquisition closed) that management was extending vendor payments in response to a reduction in revenues.  In April 2020, management retained AlixPartners to advise on and assist the Company with its strategies to manage cash and preserve liquidity.  In materials sent to the Post-C&J Directors on or around April 30, 2020, AlixPartners identified up to approximately $65 million in "potential liquidity levers," including "[s]tretching payables" in the $5.5 million to $9.8 million range.

104.    On July 14, 2020, the Company's CFO, David Schorlemer, expressed his frustration in an email to the Ascribe Directors explaining that the Company was "in a cash crisis

and, as I've mentioned before, running a company of this size with sub $5-10 million in liquidity is very challenging.  AR can fluctuate rapidly with big payments and lagging invoicing activity. The AlixPartners presentations don't seem to convey the realities of doing what we're doing day-to-day to maintain cash to run the business."  He further noted that the Company was "dealing with a borrowing base that is scraping bottom with a stressed vendor situation" and that "our condition is holding us back."  Mr. Schorlemer forwarded his email to the other Post-C&J Directors the next day.  Just a month later, in August 2020, Board materials warned that "[v]endor payments [had] been stretched beyond tenable levels."

105.    Ascribe was actively involved in the Company's management of trade payables. As early as March 2020, the Ascribe Directors became involved in conversations concerning management of liquidity.  They thereafter had frequent meetings and communications with management and advisors on the topic of liquidity, including vendor payments and management of accounts payable.

**B.  Basic Takes on Additional Debt.**

106.    By the third quarter of 2020, Basic was running on fumes and did not have sufficient liquidity to make the $16.1 million interest payment due on the Secured Notes on October 15. Because a payment default would have likely precipitated a bankruptcy filing, the Post-C&J Directors chose to saddle an over-leveraged and insolvent Basic with additional debt to make the interest payment.

107.    On October 15, 2020, the Company entered into a $15 million Second Lien Delayed Draw Promissory Note with Ascribe (the "Second Lien Promissory Note").  The funds were drawn in two equal tranches of $7,500,000 in October and December 2020.  The Second Lien Promissory Note was secured by a second lien on the ABL Collateral.

### C.  Basic Launches a Pointless Exchange Offer.

108.    On October 14, 2020, the Company received a letter from an ad hoc group representing approximately 75% of the outstanding Secured Notes (the "Ad Hoc Group"). The letter noted the Ad Hoc Group's willingness and ability to provide options to address the Company's overleveraged capital structure and liquidity constraints.  The letter urged the Company to engage with the Ad Hoc Group and expressed the group's willingness to sign non-disclosure agreements to explore liability management options.  The Post-C&J Directors chose to ignore the Ad Hoc Group and directed Weil to respond with a "cursory letter."

109.    On November 4, 2020, the Post-C&J Directors (with the Ascribe Directors abstaining) voted to approve an exchange offer.  This was merely a delay tactic.  On November 5, 2020, without consulting with the Ad Hoc Group, the Company launched a private offer to exchange the Secured Notes for newly issued 11% Senior Secured Notes due 2025 (the "Proposed New Notes") at 40 cents on the dollar, and provide for a $20 million rights offering (the "Rights Offering") to holders of its Secured Notes participating in the Exchange Offer to purchase new 9.75% Super Priority Lien Senior Secured Notes due 2025 (the "Proposed New Super Priority Notes") to be issued by the Company (the "Exchange Offer").

110.    Pursuant to the Exchange Offer, (i) $100 million of the existing Secured Notes would be left behind and stripped of all covenants and security, (ii) none of Ascribe's equity would be diluted by any equity offered to the noteholders, (iii) Ascribe's Second Lien Promissory Note would be exchanged for the Proposed New Super Priority Notes, and (iv) to the extent the Company was required to reimburse Ascribe for the Make-Whole Reimbursement but was unable to do so in cash, the Company would have to pay the obligation in New Super Priority Notes with an aggregate principal amount equal to the portion of the Make-Whole Reimbursement not paid in cash.  Each of these terms were highly (and unjustifiably) favorable to Ascribe and all but

ensured that the Exchange Offer – which required the consent of at least two thirds of existing noteholders – would fail.

111.    On November 11, 2020, the Ad Hoc Group sent a second letter to the Company. The letter objected to the Company's launch of the Exchange Offer without providing advance notice to the Ad Hoc Group and confirmed that the Ad Hoc Group did not support the Exchange Offer and would not, under any circumstances, consent to or participate in the Exchange Offer. Without the participation of the Ad Hoc Group, the Exchange Offer was doomed to fail. Nonetheless, on November 20, 2020, the Company extended the deadlines for the Exchange Offer. On December 8, 2020, the Exchange Offer expired in accordance with its terms without any notes accepted for exchange.

112.    The Company wasted over $3 million pursuing the pointless Exchange Offer. While the Exchange Offer was nominally approved by the purportedly independent Post-C&J Special Committee, that committee allowed Ascribe to drive the process and the outcome.  Internal Company documents show that Ascribe communicated directly with Deutsche Bank, advisor to the Company, regarding the Exchange Offer without any oversight or input from the Post-C&J Special Committee.  Ascribe ultimately drove the outcome of the Exchange Offer by demanding demonstrably unreasonable terms that all but ensured the Exchange Offer would fail.

113.    Because the Company was insolvent, the Post-C&J Directors had a duty to preserve the Company's assets for the benefit of its creditors.  The Post-C&J Directors consciously disregarded their fiduciary duties by doing nothing to address the Company's deepening insolvency and delaying an inevitable bankruptcy filing for the sole benefit of Ascribe.

## VI.   BASIC ISSUES THE MAKE-WHOLE NOTES GUARANTEED BY THE DEBTOR-SUBSIDIARIES TO SATISFY AN OBLIGATION OF BASIC HOLDCO

114.   In the wake of the failed Exchange Offer, Basic HoldCo was faced with the impending Make-Whole Reimbursement to Ascribe due March 2021.  By the beginning of 2021, the Company's Secured Notes were trading at approximately 20 cents on the dollar.  As a result, Basic HoldCo needed to either pay Ascribe as much as $34.4 million in cash or else issue approximately $135 million in additional Secured Notes – an aggregate issuance prohibited by the Company's operative debt documents.

115.   Further, the Company was faced with its obligation to make a $16.3 million interest payment on the Secured Notes in April 2021.  The Company again engaged Lazard to evaluate the Company's financial position and potential strategic options.  Lazard prepared a list of potential lenders that might be interested in refinancing the Company's ABL Facility with Bank of America to provide the Company with additional liquidity, and also discussed seeking waivers from Bank of America in lieu of refinancing.

116.   Basic encouraged Ascribe to seek an extension of its own obligations to NexTier, but on or around March 17, 2021, NexTier indicated that it expected Ascribe to repurchase the Secured Notes by March 30, 2021, at par value.  In turn, on or around March 19, 2021 (at a time when Basic was in distress), Mr. First advised Basic that Ascribe expected Basic to timely satisfy its Make-Whole Reimbursement obligation to Ascribe under the Exchange Agreement, and Basic and Ascribe engaged in settlement negotiations.

117.   On or around March 31, 2021, one year after the Company acquired C&J, Ascribe repurchased the $34.35 million of Secured Notes at par value plus accrued interest, in accordance with the terms of the Purchase Agreement.  At that time, Basic HoldCo, together with the Debtor-Subsidiaries, had less than $5 million of cash on hand and no capacity under the limitations

imposed by the operative debt documents to issue the approximately $135 million of incremental Secured Notes otherwise required to satisfy the Make-Whole Reimbursement obligation under the Exchange Agreement.  At most, the Company was then able to issue approximately $47.5 million of incremental Secured Notes.

118.    On March 31, 2021, the Company and Ascribe entered into the Second Amendment to Exchange Agreement (the "Second Amendment"), which exhausted the Company's remaining debt incurrence capacity by issuing $47.5 million aggregate principal amount of Secured Notes to Ascribe (the "Make-Whole Notes").  The Make-Whole Notes were guaranteed on a joint and several basis by each of the Debtor-Subsidiaries and were secured by substantially all of the Debtor-Subsidiaries' assets.  The Company also agreed to pay all reasonable expenses of Ascribe's counsel in connection with settling the "make-whole," which totaled at least $300,000 at a time when the Company was failing to pay its ordinary course trade creditors.

119.    When the Company issued the Make-Whole Notes, the market pricing indicated that the Company's secured debt was already impaired by a significant margin before being diluted by the additional $47.5 million of Secured Notes issued to Ascribe.  Any reimbursement claim Ascribe may have held against Basic HoldCo was almost certainly of *de minimis*, if any, economic value as of March 31, 2021.

120.    As a result of the Make-Whole Transaction, the Debtor-Subsidiaries were saddled with new, secured debts to resolve a claim on a contract to which they were not even parties, and Ascribe converted its worthless contract claim against a single, structurally subordinate entity into secured obligations owned on a joint and several basis by each Debtor-Subsidiary.

121.     At the time of the Make-Whole Transaction, upon information and belief, Mr. Schilling was the sole director or manager of each of the Debtor-Subsidiaries.  Mr. Schilling was also the Company's CEO and a member of Basic HoldCo's Board, rendering him a fiduciary of both Basic HoldCo and the Debtor-Subsidiaries and irreconcilably conflicted with respect to the Make-Whole Transaction.

122.     Mr. Schilling failed to investigate whether the Make-Whole Transaction was in the best interests of the Debtor-Subsidiaries before consenting to the issuance of the Make-Whole Notes.  Mr. Schilling did not, in his capacity as director or manager of the Debtor-Subsidiaries, deliberate whether to approve the Make-Whole Transaction.  He did not retain advisors or evaluate whether he had different duties, different stakeholders, or different considerations than the HoldCo Board in approving the Make-Whole Transaction and saddling the Debtor-Subsidiaries with the Make-Whole Notes.  Mr. Schilling's execution of the guarantee and security agreements on behalf of the Debtor-Subsidiaries did not constitute an informed judgment or decision on behalf of the Debtor-Subsidiaries to which he owed fiduciary duties, including the trade vendors who had been stretched for more than a year.

123.     Because the Debtor-Subsidiaries were insolvent at the time of the Make-Whole Transaction, Mr. Schilling was required to consider the interests of the Debtor-Subsidiaries and their creditors in approving the transaction.  In breach of his fiduciary duties, Mr. Schilling failed to investigate, inform himself, and deliberate as to the effect of the Make-Whole Transaction on the Debtor-Subsidiaries' creditors.  Instead, Mr. Schilling capitulated to the parochial and conflicted interests of Ascribe.

## VII.    BASIC FILES FOR BANKRUPTCY FOR THE SECOND TIME IN FIVE YEARS

124.     Having satisfied the Make-Whole Reimbursement obligation for the benefit of Ascribe and having exhausted any financial runway, the Company was forced to initiate bona fide

discussions with the Ad Hoc Group in March 2021 regarding a restructuring transaction.  On May 3, 2021, the Company entered into that certain Super Priority Credit Agreement (the "Super Priority Credit Agreement") among the Company, the lenders party thereto, including certain members of the Ad Hoc Group and Ascribe, and Cantor Fitzgerald Securities, as administrative agent and collateral agent. The Super Priority Credit Agreement provided for a super priority loan facility consisting of term loans in an aggregate principal amount of $10 million (the "Bridge Facility"). The proceeds of the Bridge Facility were used for working capital and other general corporate purposes to provide the Company with sufficient liquidity to operate its business while it continued its negotiations regarding the terms of a restructuring transaction and DIP financing.

125.    When the Company and the Ad Hoc Group were not able to agree upon the terms of a standalone reorganization transaction, the Company pivoted to a sale and marketing process. On August 17, 2021, the Company filed for bankruptcy for the second time in five years.  Pursuant to the Company's liquidating Chapter 11 plan, the Company's secured creditors recovered less than 20% of the value of their claims and the Company's general unsecured creditors recovered less than 5% of the value of their claims.

## CAUSES OF ACTION

### COUNT I

### Breach of Fiduciary Duty
### (Against the C&J Directors in Connection with the C&J Acquisition)

126.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

127.    By virtue of C&J Directors' position as directors of the Board, a fiduciary relationship existed between the C&J Directors and Basic HoldCo.  Additionally, because Basic HoldCo was insolvent in March 2020 by a wide margin, the C&J Directors' fiduciary duties in the

management of Basic HoldCo did not extend to its shareholders.  Based on its extensive knowledge

of the Company and the industry in which it operates, the C&J Directors knew that Basic HoldCo

was insolvent in March 2020.

128.    As fiduciaries, the C&J Directors were obligated to act in a fully informed manner,

in a manner consistent with the interests of Basic HoldCo, and with the highest degree of loyalty,

due care, and good faith.

129.    The C&J Directors breached their fiduciary duties to Basic HoldCo – including

their duties of loyalty, care and good faith – and acted with gross negligence and recklessness by

(i) approving the C&J Acquisition in spite of being conflicted, controlled, and beholden to Ascribe,

(ii) blindly approving the C&J Acquisition knowing that none of the financial models and data

available to them were reliable in light of the unprecedented collapse in commodity prices caused

by, among other things, a worldwide pandemic, (iii) failing to properly inform themselves and

evaluate whether the C&J Acquisition was in the best interest of (and the best option available to)

Basic HoldCo and its creditors (as opposed to its out-of-the-money shareholders, including

Ascribe), (iv) failing to properly inform themselves and consider the tax implications of the C&J

Acquisition or whether a debt-to-equity exchange would be preferable to the C&J Acquisition

because it could be structured to preserve more than $600 million of the Company's NOLs,

(v) ignoring an alternative bid to purchase the Company and dismissing the offer in a 30-minute

Board meeting, and (vi) failing to make any effort to market-test the Ascribe financing proposal

with the Company's other noteholders.  Additionally, Mr. Schilling breached his fiduciary duties

to Basic HoldCo by failing to convey the noteholders' level of interest in a debt-to-equity exchange

in a deliberate effort to chill competitive bidding.

130.     The C&J Directors' breach of fiduciary duties damaged Basic HoldCo and its creditors by, among other things, (i) harming and diminishing the value of Basic HoldCo and deepening Basic HoldCo's insolvency by causing Basic HoldCo to spend all of its cash on hand to purchase a company the C&J Directors knew or should have known would decrease cash flow given market conditions at the time of the C&J Acquisition, and (ii) approving a sale of the Company to its controlling shareholder for little to no consideration without any process that would allow for a meaningful opportunity for competitive bidding and by refusing to consider, investigate, or promote available competitive alternative transactions.

## COUNT II

### Breach of Fiduciary Duty

**(Against Mr. Schilling in Connection with the C&J Acquisition)**

131.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

132.     Upon information and belief, at the time of the C&J Acquisition, Mr. Schilling was the sole director or manager of each of the Debtor-Subsidiaries.  By virtue of Mr. Schilling's position as director or manager of each of the Debtor-Subsidiaries, a fiduciary relationship existed between Mr. Schilling and the Debtor-Subsidiaries he served.  Additionally, because the Debtor-Subsidiaries were insolvent in March 2020 by a wide margin, Mr. Schilling's fiduciary duties in the management of the Debtor-Subsidiaries extended to the Debtor-Subsidiaries' creditors.  Based on his extensive knowledge of the Company and the industry in which it operates, Mr. Schilling knew that the Debtor-Subsidiaries were insolvent in March 2020.

133.     As a fiduciary of the Debtor-Subsidiaries, Mr. Schilling was obligated by virtue of his duty of loyalty to act in a fully informed manner, in a manner consistent solely with the best interests of the Debtor-Subsidiaries he served, and with the highest degree of good faith.  At all

relevant times, Mr. Schilling had an irreconcilable conflict of interest by virtue of his role as a director of Basic Holdco, the parent company of the Debtor-Subsidiaries that had no economic interest in the Debtor-Subsidiaries based on their insolvency.

134.    The C&J Acquisition was financed in part with proceeds from the sale of pressure pumping assets owned by Debtor-Subsidiary, Basic LP.  Because the acquired C&J entities became direct subsidiaries of Basic HoldCo, the purchase was effectively funded via dividend. Mr. Schilling did not retain advisors or evaluate whether he had different duties, different stakeholders, or different considerations than the HoldCo Board in approving the use of Basic LP's assets to fund the C&J Acquisition.

135.    Mr. Schilling breached his fiduciary duties to Basic LP and its creditors – including his duties of loyalty, care, and good faith – and acted with gross negligence and recklessness by (i) approving the C&J Acquisition in spite of being conflicted, controlled, and beholden to Basic HoldCo and Ascribe, (ii) abdicating his duties to meet and deliberate whether to approve the C&J Acquisition in his capacity as Basic LP's manager, and (iii) failing to investigate and inform himself properly before approving the use of Basic LP's assets to fund the C&J Acquisition.

136.    Moreover, pursuant to the Exchange Agreement, if the Company did not have cash sufficient to satisfy Basic HoldCo's Make-Whole Reimbursement obligation to Ascribe, Basic HoldCo was obligated to issue Secured Notes guaranteed on a joint and several basis by each of the Debtor-Subsidiaries.  Mr. Schilling did not retain advisors or evaluate whether he had different duties, different stakeholders, or different considerations than the HoldCo Board in approving the C&J Acquisition and potentially saddling the Debtor-Subsidiaries with the Make-Whole Reimbursement obligation.

137.   Mr. Schilling breached his fiduciary duties to the Debtor-Subsidiaries and their creditors – including his duties of loyalty, care, and good faith – and acted with gross negligence and recklessness by (i) approving the C&J Acquisition in spite of being conflicted, controlled, and beholden to Basic HoldCo and Ascribe, (ii) abdicating his duties to meet and deliberate in his capacity as sole director or manager of the Debtor-Subsidiaries, and (iii) failing to investigate and inform himself properly of the effect of the C&J Acquisition on the Debtor-Subsidiaries and their creditors.

138.   Mr. Schilling's breach of fiduciary duties damaged Basic LP and the other Debtor-Subsidiaries and their creditors by, among other things, (i) harming and diminishing the value of Basic LP by transferring value from Basic LP to its parent for no consideration, and (ii) harming and diminishing the value of the Debtor-Subsidiaries by causing Basic HoldCo to incur the obligation to issue Secured Notes guaranteed on a joint and several basis by the Debtor-Subsidiaries for the sole purpose of satisfying a contractual obligation of Basic HoldCo to finance the C&J Acquisition.

## COUNT III

## **Breach of Fiduciary Duty**

## (**Against the Post-C&J Directors For Delaying Bankruptcy for The Sole Benefit of Ascribe**)

139.   Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

140.   By virtue of Post-C&J Directors' position as directors of the Board, a fiduciary relationship existed between the Post-C&J Directors and Basic HoldCo.  Additionally, because Basic HoldCo was insolvent at all times relevant hereto, the Post-C&J Directors also owed fiduciary duties to Basic HoldCo's creditors.  It was clear that a bankruptcy filing was inevitable and in the best interests of Basic's creditors.  However, if the Company filed for bankruptcy before

the first anniversary of the C&J Acquisition, the Make-Whole Reimbursement – an obligation of Basic HoldCo alone – would be worthless to Ascribe.  It was thus in Ascribe's interest to delay a bankruptcy filing until March 2021.

141.    As fiduciaries, the Post-C&J Directors were obligated to preserve Basic HoldCo's assets for the benefit of Basic HoldCo, and to act in a fully informed manner, in a manner consistent with the interests of Basic HoldCo, and with the highest degree of loyalty, due care, and good faith.

142.    The Post-C&J Directors breached their fiduciary duties to Basic HoldCo –including their duties of loyalty, care and good faith – and acted with gross negligence and recklessness by doing nothing to address Basic HoldCo's deepening insolvency and delaying an inevitable bankruptcy filing for the sole benefit of Ascribe by (i) extending trade payables, (ii) causing Basic HoldCo to incur additional debt, and (iii) spending millions of dollars to launch an exchange offer the Post-C&J Directors knew would fail.

143.    The Post-C&J Directors' breach of fiduciary duties damaged Basic HoldCo and its creditors by, among other things, deepening Basic's insolvency and diminishing creditor recoveries in bankruptcy.

## COUNT IV

### Breach of Fiduciary Duty

### (Against Mr. Schilling in Connection with the Make-Whole Transaction)

144.    Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

145.    By virtue of Mr. Schilling's position as director or manager of each of the Debtor-Subsidiaries, a fiduciary relationship existed between Mr. Schilling and the Debtor-Subsidiaries he served.  Additionally, because the Debtor-Subsidiaries were insolvent in March 2021, Mr. Schilling's fiduciary duties in the management of the Debtor-Subsidiaries did not extend to

Basic HoldCo or its shareholders.  Based on his extensive knowledge of the Company and the industry in which it operates, Mr. Schilling knew that the Debtor-Subsidiaries were insolvent in March 2021.

146.    As a fiduciary of the Debtor-Subsidiaries, Mr. Schilling was obligated by virtue of his duty of loyalty to act in a fully informed manner, in a manner consistent solely with the best interests of the Debtor-Subsidiaries he served, and with the highest degree of due care and good faith.

147.    At the time of the Make-Whole Transaction, upon information and belief, Mr. Schilling was the sole director or manager of each of the Debtor-Subsidiaries.  Mr. Schilling was also the Company's CEO and a member of Basic HoldCo's Board, rendering him a fiduciary of both Basic HoldCo and the Debtor-Subsidiaries.  Mr. Schilling thus had an irreconcilable conflict with respect to the Make-Whole Transaction.

148.    Mr. Schilling breached his fiduciary duties to the Debtor-Subsidiaries – including his duties of loyalty, care, and good faith – and acted with gross negligence and recklessness by (i) approving the Make-Whole Transaction in spite of being conflicted, controlled, and beholden to Basic HoldCo and Ascribe, (ii) abdicating his duties to meet and deliberate, (iii) failing to investigate and inform himself properly of the effect of the Make-Whole Transaction on the Debtor-Subsidiaries and their creditors, and (iv) entering into the Make-Whole Transaction solely to benefit Ascribe.

149.    Mr. Schilling's breach of fiduciary duties damaged the Debtor-Subsidiaries and their creditors by, among other things, (i) harming and diminishing the value of the Debtor-Subsidiaries through the incurrence of the Make-Whole Notes, for the sole purpose of satisfying an obligation of Basic HoldCo and (ii) improperly subordinating the interests of the Debtor-

Subsidiaries' existing creditors in the Debtors-Subsidiaries' assets to Ascribe, when the Debtor-Subsidiaries were forced to become jointly and severally liable as guarantors of the Make-Whole Notes, which were issued for the sole purpose of satisfying an obligation of Basic HoldCo.

## RESERVATION OF RIGHTS

150.     Plaintiff reserves its right to amend this Complaint to include (i) further information regarding the causes of action alleged herein, (ii) additional defendants, or (iii) additional causes of action that may become known to Plaintiff at any time during this proceeding, through formal discovery or otherwise, and for the amendments to relate back to the date of the filing of this original Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, by reason of the foregoing, Plaintiff prays for judgment:

a)     Awarding Plaintiff judgment in an amount to be determined at trial;

b)     Awarding Plaintiff all fees, costs, and expenses incurred in connection with investigating and prosecuting the claims and causes of action alleged herein; and

c)     Granting Plaintiff such other and further relief as this Court deems just and proper.

Dated: April 17, 2023.

Respectfully submitted,

**JACKSON WALKER LLP**

/s/ *Veronica A. Polnick*
Matthew D. Cavenaugh (TX Bar No. 24062656)
Veronica A. Polnick (TX Bar No. 24079148)
1401 McKinney St., Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Email:  mcavenaugh@jw.com
Email: vpolnick@jw.com

-and-

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn (*pro hac vice* pending)
Kurt A. Mayr (*pro hac vice* pending)
Agustina G. Berro (*pro hac vice* pending)
1185 Avenue of the Americas, Fl. 22
New York, New York 10036
Telephone: (212) 970-1600
Email:  aglenn@glennagre.com
        kmayr@glennage.com
        aberro@glennagre.com

*Attorneys for Plaintiff*